UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------
**DOHYUN KIM,**

                Plaintiff,

        **DECISION AND ORDER**

        **-** against **-**

        14-cv-3799 (AMD) (AKT)

**ISRAEL RODRIGUEZ,**

                Defendant.
-------------------------------------------------------------

**ANN DONNELLY,** District Judge.

The plaintiff seeks damages, which are not recoverable through no-fault insurance, in connection with a motor vehicle collision that occurred on November 19, 2012 on Route 25A in Wading River, New York. The defendant moves for summary judgment on the grounds that the plaintiff failed to establish that he sustained "serious injury" as a result of the motor vehicle collision. The plaintiff opposes this motion. For the reasons discussed below, the defendant's motion is granted, and the action is dismissed.

## BACKGROUND

**A. November 19, 2012 Collision and its Aftermath**

On November 19, 2012 between 9:00 p.m. and 11:00 p.m., the parties were traveling westbound on Route 25A in Wading River, New York.[1] (Def.'s 56.1 ¶¶ 1–4; Pl.'s 56.1 ¶¶ 1–4.) The plaintiff, in his 2008 Volkswagen Rabbit, was following an eighteen wheel tractor-trailer operated by the defendant. (Def.'s 56.1 ¶ 3; Pl.'s 56.1 ¶ 3.) The parties slowed down as they

---

[1] According to the plaintiff, Route 25A is four lanes across, including one eastbound lane for travel and one turn lane, and one westbound lane for travel and one turn lane. (Pl.'s 56.1 ¶ 2.)

1

approached the intersection of Route 25A and Wading River Road.  (Def.'s 56.1 ¶ 6; Pl.'s 56.1 ¶ 6.)  As the plaintiff started to drive past the defendant on the right, the defendant's tractor-trailer turned into the front driver's side of the plaintiff's vehicle.  (Def.'s 56.1 ¶ 8; Pl.'s 56.1 ¶ 8.)  The plaintiff asserts that the defendant was driving 35 miles per hour at the time of impact, but the defendant contends that he was traveling 5 or 10 miles per hour.  (Def.'s 56.1 ¶ 7; Pl.'s 56.1 ¶ 7.)

According to the plaintiff, he lost consciousness, and awoke to the "smell of the airbag," and "realized" he was "still alive."  (Pl.'s 56.1 ¶ 10.)  The seatbelt bruised his chest, and he had pain in his neck, shoulders, and back.  (Pl.'s 56.1 ¶ 10.)  He also experienced pain and swelling in both knees, but could not remember whether his right knee was bruised.  (Pl.'s 56.1 ¶¶ 10, 13.)

The plaintiff got out of his car without help, walked to the sidewalk next to Route 25A without limping, and waited for the police.  (Def.'s 56.1 ¶¶ 10–11; Pl.'s 56.1 ¶¶ 10–11.)  When police and emergency medical technicians arrived, the plaintiff refused treatment and did not go to the hospital.  (Def.'s 56.1 ¶ 11; Pl.'s 56.1 ¶ 11.)  His friend drove him home.  (Def.'s 56.1 ¶ 14; Pl.'s 56.1 ¶ 14.)

Once the plaintiff arrived home, he got undressed, got into pajamas, and went to sleep.  (Def.'s 56.1 ¶ 15; Pl.'s 56.1 ¶ 15.)  That night, he experienced "stiffness all over [his] body."  (Pl.'s 56.1 ¶ 15.)  The next morning, he woke up, took a shower, got dressed, and went to work at Brookhaven Laboratories.  (Def.'s 56.1 ¶ 15; Pl.'s 56.1 ¶ 15.)  Although in the days and months after the collision, following his routine was "pretty hard," and "not easy," he continued to go about his daily life and performed his normal work responsibilities.  (Def.'s 56.1 ¶ 16; Pl.'s 56.1 ¶ 16.)  The plaintiff did not miss any work as a result of the collision.  (Def.'s 56.1 ¶ 16; Pl.'s 56.1 ¶ 16.)

By January 12, 2013, fifty-four days after the collision, the pain in his neck, back, and knee had improved. (Def.'s 56.1 ¶ 25; Pl.'s 56.1 ¶ 25.) The plaintiff had arthroscopic surgery on his right knee on March 8, 2013—109 days after the collision. (Def.'s 56.1 ¶ 26; Pl.'s 56.1 ¶ 26.) There were no complications with the surgery, and the plaintiff reported that his knee "felt better" after the operation. (Def.'s 56.1 ¶ 28; Pl.'s 56.1 ¶ 28.)

On August 16, 2013, the plaintiff was involved in a second motor vehicle accident.[2] (Def.'s 56.1 ¶ 27; Pl.'s 56.1 ¶ 27.) As a result of this accident, the plaintiff re-injured his right knee, and the pain in his back "got worse." (Def.'s 56.1 ¶¶ 29, 31; Pl.'s 56.1 ¶¶ 29, 31.)

### B. Medical History, Treatment, and Evaluations

About a year before the collision, on October 28, 2011, the plaintiff sought medical attention from Brookhaven National Laboratory Occupational Medical Clinic, and complained of right knee pain, including tenderness over the medial meniscus.[3] (Def.'s 56.1 ¶ 19; Pl.'s 56.1 ¶ 19.)

The plaintiff alleges that he sustained the following injuries as a result of the November 19, 2012 collision with the defendant: (a) focal tear of the anterior horn of the medial meniscus of the right knee; (b) grade one medical menisco-capsular separation of the right knee; (c) focal tear of the anterior fibers of the tibial collateral ligament of the right knee; (d) joint effusion of the right knee; (e) right knee arthroscopy: (f) partial synovectomy; (g) partial meniscectomy; (h) abrasion arthroplasty; (i) removal of joint loose body; (j) examination of right knee under anesthesia; (k) postoperative diagnosis of right knee synovitis; (l) chondromalacia; (m) meniscus tear joint loose body; (n) bulging of Annulus Fibrrosus at L4-L5 level, causing pressure effect on

---

[2] The defendant was not involved in this collision. (Def.'s 56.1 ¶ 27; Pl.'s 56.1 ¶ 27.)
[3] The plaintiff does not dispute that October 28, 2011 medical records from Brookhaven National Laboratory Occupational Medical Clinic indicate that the plaintiff complained of right knee pain. (Def.'s 56.1 ¶ 19; Pl.'s 56.1 ¶ 19.) Instead, the plaintiff contends that he complained of right foot pain caused by gout. (Pl.'s 56.1 ¶ 19.)

3

the thecal sac; (o) bulging of Annulus Fibrrosus at C5-C6 level, causing pressure effect on the thecal sac; (p) left L5 radiculopathy; (q) internal derangement of knee; (r) sprain of knee/leg; (s) cervical strain/sprain; (t) cervical musculoligamentous strain and sprain; (u) lumbar musculoligamentous strain and sprain; (v) shoulder pain; (w) cervicalgia; (x) lumbago; and (y) knee pain. (Def.'s 56.1 ¶ 17; Pl.'s 56.1 ¶ 17.) The plaintiff did not seek any treatment for these alleged injuries until December 8, 2012—nineteen days after the collision with the defendant.[4] (Def.'s 56.1 ¶ 18; Pl.'s 56.1 ¶ 18.)

### i. Dr. Taegyun Kim

Dr. Taegyun Kim at the Seoul Pain Clinic, Golden Aqua Acupuncture Facility, in Flushing, New York examined the plaintiff on two occasions.[5] On December 8, 2012, the plaintiff saw Dr. Kim for an initial examination, at which he complained of neck pain that radiated to both arms, lower back pain, and right knee pain. (Pl.'s Ex. B (ECF No. 40).) His range of motion was within normal limits.[6] (Def.'s 56.1 ¶ 21; Pl.'s 56.1 ¶ 21.) Dr. Kim referred the plaintiff for an MRI of his cervical spine, lumbar spine, and right knee, prescribed Motrin as needed, and instructed the plaintiff to return within four weeks. (Pl.'s Ex. B (ECF No. 40).) The plaintiff saw Dr. Kim for a follow-up examination on January 12, 2013. (Pl.'s Ex. B (ECF No. 40).) By that date, the pain in his neck, low back, and right knee was improving. (Def.'s 56.1 ¶ 25; Pl.'s 56.1 ¶ 25.) Dr. Kim instructed the plaintiff to continue with physical therapy, take Motrin as needed, and come back within four weeks. (Pl.'s Ex. B (ECF No. 40).)

---

[4] The plaintiff testified at deposition that he saw a medical doctor for his injuries "two to three days" after the accident, but offered no documentation to support this claim. (Def.'s 56.1 ¶ 18; Pl.'s 56.1 ¶ 18.)
[5] The plaintiff asserts that Dr. Kim has an "M.D.," but does not otherwise disclose any details about Dr. Kim's practice. (Pl.'s Opp. at 4 (ECF No. 40-2).)
[6] The plaintiff does not deny that the records of his initial examination revealed no limitation on his range of motion. Instead, he cites to his own testimony about the after effects of the accident. (Pl.'s 56.1 ¶ 21.)

Dr. Kim's unsworn letters describing the December 8, 2012 and January 12, 2013 examinations listed the following impressions: cervicalgia, lumbago, knee pain, cervical strain/sprain, lumbar strain/sprain, and a medial meniscus tear. (Pl.'s Ex. B (ECF No. 40).)

## ii. Dr. Ayoob Khodadadi (Radiologist)

Between December 20, 2012 and January 3, 2013, the plaintiff had an MRI of his right knee, his lumbar spine, and his cervical spine at Springfield Radiology Imaging, P.C. in Bayside, New York. (Def.'s 56.1 ¶¶ 22–24; Pl.'s 56.1 ¶¶ 22–24; Pl.'s Ex. C (ECF No. 40).) Radiologist Dr. Ayoob Khodadadi reviewed the results of the MRI; his opinions were submitted as an undated sworn affirmation. (Pl.'s Ex. C (ECF No. 40).)

With respect to the plaintiff's right knee, Dr. Khodadadi observed no abnormal marrow to suggest fracture, bone contusion, osteonecrosis, or marrow replacement. (Def.'s 56.1 ¶ 22; Pl.'s Ex. C (ECF No. 40).) However, there was a focal tear of the anterior horn of medial meniscus, a grade one medial menisco-capsular separation, and a focal tear of the anterior fibers of the tibial collateral ligament. (Def.'s 56.1 ¶ 22; Pl.'s Ex. C (ECF No. 40).) Dr. Khodadadi noted joint swelling, which he opined "could be posttraumatic in nature." (Def.'s 56.1 ¶ 22; Pl.'s Ex. C (ECF No. 40).)

Dr. Khodadadi also reviewed the images of the plaintiff's spine. (Def.'s 56.1 ¶¶ 23–24; Pl.'s Ex. C (ECF No. 40).) He observed straightening of both the cervical spine and the lumbar spine, associated with the reversal of the lordotic curvature and compatible with muscular spasms. (Def.'s 56.1 ¶¶ 23–24; Pl.'s Ex. C (ECF No. 40).) He noted bulging of the annulus fibrosus at the C5–C6 and L4–L5 levels, which causes a "pressure effect" on the thecal sac. (Def.'s 56.1 ¶¶ 23–24; Pl.'s Ex. C (ECF No. 40).)

### iii. Dr. Yan Q. Sun (Orthopedic Surgeon)

Dr. Yan Q. Sun of Sun Orthopedic Surgery, P.C. in Flushing, New York, first examined the plaintiff on January 12, 2013. (Pl.'s Ex. D (ECF No. 40).) The plaintiff complained of right knee pain resulting from a motor vehicle collision. (Pl.'s Ex. D (ECF No. 40).) Dr. Sun noted that the plaintiff limped, and that there was swelling in his right knee. (Pl.'s Ex. D (ECF No. 40).) Dr. Sun listed his impression as internal derangement, status post right knee injury.[7] (Pl.'s Ex. D (ECF No. 40).)

The plaintiff contacted Dr. Sun's office again on February 26, 2013, complaining of increased pain and stiffness. (Pl.'s Ex. D (ECF No. 40).) On March 8, 2013, the plaintiff had surgery. (Pl.'s Ex. D (ECF No. 40).) During the surgery, Dr. Sun's findings included synovitis, chrondomalacia, and meniscus tear. (Pl.'s Ex. D (ECF No. 40).) There were no complications. (Pl.'s Ex. D (ECF No. 40).) Dr. Sun saw the plaintiff for post-surgery follow-up appointments on March 16, 2013, March 23, 2013, and June 27, 2015. (Pl.'s Ex. D (ECF No. 40).) Dr. Sun last saw the plaintiff on June 27, 2015. (Pl.'s Opp. at 11 (ECF No. 40-2).) The plaintiff complained of pain and stiffness in his right knee, which was aggravated by activity. (Pl.'s Opp. at 11 (ECF No. 40-2).) Dr. Sun noted that the plaintiff's right knee was tender at the joint line, and there was muscle atrophy of the right knee. (Pl.'s Opp. at 11 (ECF No. 40-2).)

In his sworn affirmation, dated May 18, 2016, Dr. Sun opined that the plaintiff "suffers from right knee injury status post arthroscopic surgery." (Pl.'s Ex. D (ECF No. 40).) He stated: "It is my opinion within a reasonable degree of medical certainty that Mr. Kim's injuries with the right knee surgery he underwent are directly causally related to the accident of November 19,

---

[7] While Dr. Sun observed at various times that the plaintiff's extension and flexion to the right was 0/100 and 0/130 on the left, no physician provided an interpretation of this range of motion score. (Pl.'s Ex. D (ECF No. 40).)

2012 and not related to any pre-existing degenerative conditions." (Pl.'s Ex. D (ECF No. 40).)

Dr. Sun concluded:

> It is my opinion that Mr. Kim will likely have lifelong orthopedic problems including pain, difficulty with activities of daily living and activity and lifestyle modifications. This may lead to office based treatment with corticosteroid injections or physical therapy periodically. It is more likely than not because of the nature of the injury, the patient will develop post-traumatic osteoarthritis of the right knee joint in the future and may need future surgical intervention for the knee including but not limited to chondroplasty or even joint replacement.

(Pl.'s Ex. D (ECF No. 40).)

### iv. Dr. Audrey Eisenstadt (Radiologist)

The defendant's consultative radiologist, Dr. Audrey Eisenstadt, reviewed the December 2012 and January 2013 MRIs of the plaintiff's right knee, the cervical spine, and the lumbar spine.

Dr. Eisenstadt opined that the plaintiff's knee problems were caused by "longstanding degenerative joint disease . . . [which] is not traumatic in origin and has no causal relationship or association with the 11/19/12 incident." (Def.'s 56.1 ¶ 22; Def.'s Ex. U (ECF No 33-21).) Specifically, Dr. Eisenstadt observed hypertrophic bony spurring at the femoropatellar joint space and lateral aspect of the knee, which was associated with thinning of the overlying cartilage at the femoropatellar joint space. (Def.'s Ex. U.) Dr. Eisenstadt observed that these changes are typical of osteoarthritis, and that they were "well over one month in development." (Def.'s Ex. U.) Dr. Eisenstadt also observed mucoid grade II intrasubstance degenerative signal change in the posterior horn of the medial meniscus, which she said was an intrasubstance degenerative process, not traumatic in origin, and not associated with the November 19, 2012 collision. (Def.'s Ex. U.) Moreover, Dr. Eisenstadt opined that if a traumatic meniscal injury had occurred on the date of the accident, which was a month before, the MRI would have

7

revealed bony contusions, as well as ligamentous and tendinous disruption. (Def.'s Ex. U.) The plaintiff's MRI showed none of these signs. (Def.'s Ex. U.)

According to Dr. Eisenstadt, the MRIs of the plaintiff's spine likewise indicated that his issues were degenerative in nature, and not the result of trauma.[8] (Def.'s Ex. U.) In Dr. Eisenstadt's view, the MRIs showed signs of the onset of arthritic disease, which could not have developed in less than six months. (Def.'s Ex. U.) Dr. Eisenstadt also found disc bulging at C5–6, L4–L5, and L5–S1; disc bulging is not the result of traumatic injury, but is degenerative in origin. (Def.'s Ex. U.) Similarly, Dr. Eisenstadt observed [b]ony productive changes involving the facet joints" at L4–5 and L5–S1, (Def.'s 56.1 ¶ 24; Def.'s Ex. U), which were the typical places for lumbar arthritic disease to occur. (Def.'s Ex. U.) As with the plaintiff's other symptoms, this bony overgrowth could not have developed in less than six months. (Def.'s 56.1 ¶ 24; Def.'s Ex. U.) Finally, Dr. Eisenstadt also observed that "at no level [of the plaintiff's cervical spine or lumbar spine] is there an osseous contusion, disc herniation, or annular tear seen to indicate any recent posttraumatic changes involving the bony or intervertebral disc structures causally related to the 11/19/12 incident." (Def.'s 56.1 ¶ 23.)

*v. Dr. Edward S. Crane (Orthopedic Surgeon)*

The defendant's expert, orthopedic surgeon Dr. Edward Crane conducted a consultative orthopedic evaluation on June 17, 2015, and submitted a sworn statement.[9] (Def.'s Ex. T (ECF No. 33-20).) In that report, Dr. Crane noted that he reviewed medical records from Brookhaven National Laboratory Occupational Medicine Clinic, which included an October 28, 2011 note, indicating that the plaintiff complained of right knee pain. (Def.'s Ex. T.) There was tenderness

---

[8] In her evaluation of the MRI of the plaintiff's cervical spine, she noted that the straightening of the cervical lordosis is a "nonspecific finding most frequently related to patient positioning and comfort for the examination." (Def.'s Ex. U.)

[9] Dr. Crane examined the plaintiff through a translator. (Def.'s Ex. T.)

8

at the anteromedial aspect of the plaintiff's right knee along the joint line, and he was advised to see an orthopedic surgeon if the knee "continues to be a problem." (Def.'s Ex. T.)

Dr. Crane also took note of the treatment notes from Seoul Pain Clinic, Golden Aqua Acupuncture Facility. (Def.'s Ex. T.) In particular, Dr. Crane noted that the earliest treatment records for the plaintiff were dated December 8, 2012—nineteen days after the collision. (Def.'s Ex. T.) Dr. Crane opined that if the plaintiff "incurred an injury on 12/8/12 he would have sought medical care prior to 19 days later." (Def.'s Ex. T.)

At the time of the June of 2015 evaluation, the plaintiff complained of pain in his right and left knees, the left side of his back, and his right foot. (Def.'s Ex. T.) During the examination, Dr. Crane observed that the plaintiff did not limp, but walked normally and rapidly, without crutches, a cane, or a brace. (Def.'s Ex. T.) The doctor's evaluation of the plaintiff's spine revealed "slight tenderness in the lumbosacral paravertebral musculature, but no spasm." (Def.'s Ex. T.) Dr. Crane also examined both of the plaintiff's knees, and saw that the plaintiff had "flat arthroscopic portal scars at his right knee." (Def.'s Ex. T.) Dr. Crane found that the plaintiff's range of motion of both knees was pain-free and identical. (Def.'s Ex. T.) Both knees were "slightly tender over the anterior aspect of the medial joint line, just medial to the patellar tendon." (Def.'s Ex. T.) Otherwise, there was no tenderness in either knee. (Def.'s Ex. T.)

Dr. Crane concluded that, "aside from the arthroscopic portal scars," there was "no objective evidence of any orthopedic residuals." (Def.'s Ex. T.) Specifically, Dr. Crane opined that the plaintiff "had an excellent result from surgery," and that he would not require any further treatment. (Def.'s Ex. T.) His prognosis was "excellent." (Def.'s Ex. T.) Moreover, Dr. Crane opined that "[t]o a reasonable degree of medical certainty, there is no causal connection between the alleged accident of 11/19/12 and his complaints of pain in those areas." (Def.'s Ex. T.) In

9

reaching this conclusion, Dr. Crane observed that the plaintiff "complained of pain at the right knee and had tenderness at the anteromedial aspect of the joint *before* the accident of 11/19/12. The location of the tenderness is the same as the site where he allegedly had a medial meniscal tear at surgery." (Def.'s Ex. T.)

### C. Procedural History

The plaintiff filed suit against the defendant in New York Supreme Court, Suffolk County, on February 7, 2014 for damages in excess of those covered by no-fault insurance.[10] The defendant removed the case to this court on June 18, 2014, pursuant to 28 U.S.C. §§ 1441 and 1332.[11] The defendant moved for summary judgment on April 16, 2016, on the ground that the plaintiff had not demonstrated that he sustained "serious injury" as a result of the motor vehicle collision, as required by Section 5104 of the Insurance Law of the State of New York. For the reasons that follow, the defendant's motion is granted, and the case is dismissed.

## DISCUSSION

Summary judgment is appropriate if "there is no genuine issue of material fact," and thus "the moving party is entitled to judgment as a matter of law." *Globecon Grp., LLC v. Hartford Fire Ins. Co.*, 434 F.3d 165, 170 (2d Cir. 2006) (quoting Fed. R. Civ. P. 56(c)). The district court is to make all reasonable inferences and resolve all ambiguities in favor of the non-moving party. *Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 545 (2d Cir. 2010).

Local Rule 56.1 requires that the parties each submit a statement of material facts, together with a citation to the admissible record evidence supporting each fact, in connection with summary judgment briefing. *See* Local Rule 56.1(a). If the party opposing a motion for

---

[10] The plaintiff also named Wells Fargo Equipment Finance, Inc. as a defendant. The parties stipulated to dismissal of the claims against Wells Fargo on April 15, 2015. (ECF No. 19.)
[11] This case was reassigned to me on November 24, 2015.

10

summary judgment does not refute a fact set forth in the moving party's statement of material fact, the court may deem that fact admitted. *Koontz v. Great Neck Union Free Sch. Dist.*, No. 12-cv-2538-PKC, 2014 WL 2197084, at *1 (E.D.N.Y. May 27, 2014); *see also Giannullo v. City of New York*, 322 F.3d 139, 140 (2d Cir. 2003). In this case, the plaintiff properly controverted some facts put forward by the defendant, but not others. As set out above, I deem as admitted the defendant's properly supported statements of facts that the plaintiff did not dispute.

In a case involving the no-fault law and a claim for non-economic loss, the defendant has the initial burden in his motion for summary judgment "to make an evidentiary showing that the plaintiff has not sustained a serious injury as a matter of law." *Lawyer by Norwood v. Albany OK Cab Co.*, 142 A.D.2d 871, 872 (3d Dep't 1988) (citation and internal brackets omitted); *Evans v. United States*, 978 F. Supp. 2d 148, 163 (E.D.N.Y. 2013) (same) (collecting cases). Once the defendant makes that showing, the burden shifts to the plaintiff to establish a *prima facie* case that he sustained a serious injury. *Yong Qin Luo v. Mikel*, 625 F.3d 772, 777 (2d Cir. 2010) (citation omitted). If the plaintiff demonstrates sufficient objective evidence from which a jury could find that he suffered a serious injury, summary judgment must be denied "notwithstanding some contrary probative evidence." *Evans*, 978 F. Supp. 2d at 163 (citation omitted).

Subjective complaints alone are not sufficient to defeat summary judgment. *Id.* To meet his burden, the plaintiff must provide "objective proof of an injury." *Id.* at 163. In this regard, the plaintiff must offer admissible evidence in the form of sworn medical records, such as MRI reports, and sworn affidavits or reports by physicians. *Id.* Unsworn letters or medical reports are inadmissible, and may not be considered. *Id.* (collecting cases); *see also Robinson v. United States*, No. 02-cv-5166-DF, 2005 WL 747039, at *6 (S.D.N.Y. Mar. 31, 2005) ("It is well

established that unsworn medical reports are not a form of admissible evidence capable of demonstrating a serious injury.").

Finally, in order to recover, the plaintiff must also demonstrate that his "injury was proximately caused by the accident at issue." *Carter v. Full Serv., Inc.*, 29 A.D.3d 342, 344 (1st Dep't 2006); *see also Evans*, 978 F. Supp. 2d at 164 (same) (collecting cases). "[W]hen additional contributory factors interrupt the chain of causation between the accident and claimed injury—such as a gap in treatment, an intervening medical problem or a preexisting condition— summary dismissal of the complaint may be appropriate." *Pommells v. Perez*, 4 N.Y.3d 566, 572 (2005). Here again, a defendant moving for summary judgment has the initial burden to submit "persuasive evidence" that the plaintiff had some pre-existing injuries. *Evans*, 978 F. Supp. 2d at 164. At that point, the burden shifts to the plaintiff to "come forward with evidence addressing the defendant's claimed lack of causation." *Id.* (citations omitted). If the plaintiff fails to demonstrate that there is a genuine issue of fact regarding a serious injury, proximately caused by the collision at issue, the defendant is entitled to judgment as a matter of law.

**A. New York's Comprehensive Motor Vehicle Insurance Reparations Act**

New York's Comprehensive Motor Vehicle Insurance Reparations Act ("no-fault law") requires the insurer of any vehicle owner to pay benefits to "[p]ersons, other than occupants of another motor vehicle . . . for loss arising out of the use or operation in this state of such motor vehicle." N.Y. Ins. Law § 5103(a)(1). A chief objective of New York's no-fault law was to do away with most automobile collision tort litigation and reduce the burden on courts. *Rosa v. Allstate Ins. Co.*, 981 F.2d 669, 676 n.15 (2d Cir. 1992) (citing *Palmer v. Allstate Ins. Co.*, 475 N.Y.S.2d 436, 441 (2d Dep't 1984)). To that end, a litigant may recover for "noneconomic loss"

only if he suffered "serious injury" resulting from an accident.[12]  *Palmer*, 475 N.Y.S.2d at 442.

Section 5102 defines "serious injury," in part as follows:

> personal injury which results in . . . permanent consequential limitation of use of a body organ or member; significant limitation of use of a body function or system; or a medically determined injury or impairment of a non-permanent nature which prevents the injured person from performing substantially all of the material acts which constitute such person's usual and customary daily activities for not less than ninety days during the one hundred eighty days immediately following the occurrence of the injury or impairment.

N.Y. Ins. Law § 5102(d).

To establish a "permanent consequential limitation of use of a body organ or member," a plaintiff must "demonstrate more than 'a mild, minor or slight limitation of use.'"  *Katiraeifar v. Santrizos*, 182 F.3d 900, at *1 (2d Cir. 1999) (quoting *Booker v. Miller*, 685 N.Y.S.2d 837, 838 (3d Dep't 1999)).  "[C]onsequential limitation . . . means an important and qualitative limitation of use of a body part based on normal function, purpose and use of that body part."  *Evans*, 978 F. Supp. 2d at 165.  Likewise, in order to demonstrate a "significant limitation of use of a body function or system," a plaintiff must offer "credible medical evidence" that the limitation is more than "minor, mild or slight."  *Id.* at 165–66 (citations omitted); *see also Zavialov v. Morgan*, No. 96–CV–5705 (JG), 2000 WL 133846, at *3 (E.D.N.Y. Jan. 13, 2000) (citing *Licari v. Elliott*, 57 N.Y.2d 230, 236 (1982)).

Finally, with respect to a "medically determined injury or impairment of a nonpermanent nature which prevents the [plaintiff] from performing substantially all of the material acts which constitute [his] usual and customary daily activities for not less than ninety days during the one hundred eighty days immediately following the occurrence of the injury or impairment" (the "90/180 day category"), a plaintiff must demonstrate that he was inhibited "'from performing his

---

[12] The plaintiff does not contend that he suffered economic damage in excess of "basic economic loss."  *Palmer*, 475 N.Y.S.2d at 442 (plaintiff may recover only for economic loss in excess of "basic economic loss").

usual activities to a great extent, rather than some slight curtailment' for ninety of the 180 days following the accident." *Evans*, 978 F. Supp. 2d at 166 (quoting *Licari*, 57 N.Y.2d at 236).

### B. Satisfaction of the Defendant's Burden

The evidence viewed in the light most favorable to the plaintiff, as it must be, establishes that the defendant has met his threshold burden of proving that the plaintiff did not suffer a "serious injury" as defined by Section 5102.

The defendant put forward evidence that demonstrates that the plaintiff did suffer a "consequential" or "significant limitation" as a result of the collision. There is no dispute that after the accident, the plaintiff got out of his car, did not limp, waited for the police and emergency medical services, and refused medical treatment. In the days that followed, the plaintiff went about his daily life as usual; he got up, got dressed, took care of himself, and did not miss a day of work. Dr. Crane found that the plaintiff did "not require any further treatment," his prognosis was "excellent," and there was "no objective evidence of orthopedic residuals."

In addition, the defendant has met his burden with respect to the 90/180 day category of Section 5102(d). As the defendant points out, there is no evidence that the plaintiff was unable to perform any of his usual activities at any time after the collision. The most that the plaintiff says is that he had "difficulty taking a shower and walking up and down the stairs" two or three days after the accident. (Pl.'s Opp. at 4 (ECF No. 40–2).) Notably, the plaintiff does not contend that he was *unable* to shower or take the stairs, nor does he assert that he could not do these things without assistance.

Likewise, the defendant introduced persuasive evidence that the plaintiff's injuries were pre-existing, and were not caused by the accident with the defendant.[13] Dr. Crane observed that before the subject collision, on October 28, 2011, the plaintiff complained of right knee pain, and tenderness along the joint line.[14] Dr. Crane noted that the location of the tenderness was the same as the location where he had surgery following the collision with the defendant, and opined that there was "no causal connection between the alleged accident of 11/19/12 and [the plaintiff's] complaints of pain" in his spine and right knee.[15]

The sworn reports of radiologist Dr. Eisenstadt further establish that the plaintiff's injuries were not caused by the collision. *See Arenes v. Mercedes Benz Credit Corp.*, No. 03-cv-5810-NG-MDG, 2006 WL 1517756, at *6 (E.D.N.Y. June 1, 2006) (reports of consultative physicians were sufficient to establish that the plaintiffs' injuries were not serious within the meaning of the no-fault law). Dr. Eisenstadt's review of the MRIs revealed that his injuries were degenerative, and not caused by trauma.

Accordingly, the defendant has satisfied his summary judgment burden of putting forward persuasive evidence that the plaintiff did not sustain a "serious injury" caused by the accident with the defendant.

**C. The Plaintiff's Failure to Meet His Burden**

In light of the defendant's satisfaction of his burden, I consider whether the plaintiff has sufficiently demonstrated that he sustained a "serious injury," caused by the accident with the

---

[13] The defendant maintains that there is a "serious lack of causal connection between the plaintiff's alleged injuries claimed to have resulted from the subject motor vehicle accident" and the collision. (Def.'s Mem. at 22 (ECF No. 34).)

[14] I consider the unsworn reports, to the extent that information from the reports is incorporated into the physician's sworn affirmation. *Evans*, 978 F. Supp. 2d at 168 (citation omitted).

[15] The plaintiff's claim that Dr. Crane did not specify that his opinion on causation was "within a reasonable degree of medical certainty," (Pl.'s Opp. at 12 (ECF No. 40-2)), is contradicted by the evidence. Dr. Crane specifically stated that "[t]o a reasonable degree of medical certainty, there is no causal connection between the alleged accident of 11/19/12 and [the plaintiff's] complaints of pain." (Def.'s Ex. T.)

defendant. The plaintiff offers his own affidavit, Dr. Kim's unsworn medical reports, Dr. Khodadadi's sworn interpretation of the results of the MRI evaluation, unsworn MRI reports, Dr. Sun's medical reports and treatment records, and Dr. Sun' sworn affidavit.[16] Because Dr. Kim's medical reports are unsworn and inadmissible, I decline to consider them, except to the extent that they are incorporated into Dr. Crane's report.[17]

The evidence does not support a determination that the plaintiff suffered a "permanent consequential limitation of use of a body organ or member" or a permanent "significant limitation of use of a body function or system." N.Y. Ins. Law § 5102(d). In order for a court to consider a physician's conclusions that the plaintiff's infirmity is "permanent" for purposes of the no-fault law, the doctor's affidavit must be based upon a "recent examination" of the injured plaintiff. *Evans*, 978 F. Supp. 2d at 169 (collecting cases). In this case, Dr. Khodadadi's conclusions are based on imaging taken more than three years ago, in December of 2012 and January of 2013. Neither party introduced a more recent MRI examination.

Additionally, Dr. Sun's May 18, 2016 affidavit was based on an examination that occurred about eleven months earlier, on June 27, 2015. In a lawsuit involving soft tissue injuries, like this one, a plaintiff cannot raise a triable issue as to whether he sustained a permanent serious injury when there is a gap between the most recent examination and the physician's affirmation. For example, in *Evans v. United States*, 978 F. Supp. 2d 148 (E.D.N.Y. 2013), the Honorable Arthur Spatt held that the plaintiff's submission of a physician's affidavit, which was based on an examination that had occurred twenty months earlier, was not based upon

---

[16] The court may consider unsworn reports and records, to the extent that they are incorporated into a physician's sworn affidavit. *Evans*, 978 F. Supp. 2d at 168 (collecting cases).
[17] While the unsworn MRI reports standing alone likewise would be inadmissible, because they are incorporated into Dr. Khodadadi's sworn affidavit which confirms the results of the MRI, I consider them. *See Evans*, 978 F. Supp. 2d at 168.

16

a recent examination and was thus insufficient to meet his summary judgment burden. *Id.* at 169–70. Likewise, in *Rabolt v. Park*, 50 A.D.3d 995 (2d Dep't 2008), the New York State Appellate Division, Second Department, declined to consider a physician's affirmation, dated July of 2006, because it was based on examinations that occurred in 2004 and January of 2005, and not upon a recent examination.[18] *Id.* at 995–96. This deficiency is fatal to the plaintiff's claim that he suffered a "permanent consequential limitation of use of a body organ or member" or a permanent "significant limitation of use of a body function or system."

Moreover, the plaintiff failed to offer evidence to support his claim that his injuries kept him from his usual daily activities for at least ninety days during the 180 days immediately following the collision. The plaintiff points to no evidence that he could not go about his daily activities for any period of time. Rather, he claims only that it was "not easy" to follow his daily routine in the days after the collision. This evidence is not enough to meet the disability period requirement. *See Licari*, 57 N.Y.2d at 236 ("slight curtailment" of the plaintiff's usual activities is not sufficient to meet the 90/180-day period of disability requirement).

Nor does the plaintiff's medical evidence satisfy his burden. While Dr. Khodadadi's review of the MRI revealed that there were injuries to the plaintiff's knee and bulging discs at various points in the plaintiff's spine, Dr. Khodadadi did not make any determination about the effects of these conditions on the plaintiff's ability to go about the activities of daily life.

Dr. Sun noted in a conclusory fashion that, based on his June 27, 2015 examination, the plaintiff would have "difficulty with activities of daily living and activity," which would require

---

[18] S*ee also Moore v. Edison*, 25 A.D.3d 672, 673 (2d Dep't 2006) ("results of the examination [conducted two years prior] have no probative value in the absence of a more recent examination"); *Kauderer v. Penta*, 261 A.D.2d 365, 366 (2d Dep't 1999) (the physician's affidavit failed to demonstrate the existence of a triable issue of fact because the affidavit "referred to findings made during an examination which was performed almost three years earlier, and did not indicate that the opinion expressed therein was based upon any recent medical examination of the injured plaintiff").

17

"lifestyle modifications;" however, he did not address the basis for this conclusion, nor did he describe the ways that the plaintiff's daily activities were limited, if at all. Because the plaintiff did not put forward any competent medical evidence that he sustained an injury that prevented him from performing his usual activities for ninety days, the plaintiff has not established a triable issue of fact regarding whether he sustained a serious injury.

The plaintiff also fails to carry his burden to present competent, non-conclusory evidence from which a jury could reasonably conclude that his injuries were caused by the collision with the defendant. While Dr. Khodadadi's review of the MRI of the right knee revealed swelling that "*could be* posttraumatic in nature," the doctor did not actually conclude that the plaintiff's injury was caused by trauma, rather than "other possible causes evidenced in the record." *Carter*, 29 A.D.3d at 344. To the extent that Dr. Khodadadi opined that trauma caused the swelling, he provided no "objective basis" for this conclusion. *See Montgomery v. Pena*, 19 A.D.3d 288, 290 (1st Dep't 2005). Nor did he mention or consider the plaintiff's prior complaint of knee pain. *Id.* (granting the defendant's summary judgment motion because the plaintiff's doctor failed to consider pre-existing conditions and prior injuries). "[M]ere speculation" that trauma could have caused the swelling in the plaintiff's knee is insufficient to support a finding that a causal relationship exists. *Carter*, 29 A.D.3d at 344.

The plaintiff's reference to Dr. Sun's affirmation fares no better. Dr. Sun opined "within a reasonable degree of medical certainty" that the plaintiff's pre-operative injuries to his right knee were "directly causally related to the accident of November 19, 2012 and not related to any pre-existing degenerative conditions." However, the plaintiff's physician provided no foundation for this conclusion, and failed to mention the medical records evidencing complaints

of knee pain pre-dating the collision.[19]  Because Dr. Sun did not provide "an explanation of the basis for concluding that the injury was caused by the subject accident, and not by other possible causes evidenced in the record," his opinion that the plaintiff's injury was caused by the collision is "mere speculation."  *Carter*, 29 A.D.3d at 344.  Thus, the plaintiff failed to meet his burden of establishing that he sustained a serious injury, which was caused by the accident.

## CONCLUSION

Accordingly, the defendant's motion for summary judgment is granted, and the action is dismissed.

**SO ORDERED.**

    /s/ Ann M. Donnelly\_\_\_\_\_
Ann M. Donnelly
United States District Judge

Dated: Brooklyn, New York
    November 4, 2016

---

[19] Additionally, Dr. Sun's May 18, 2016 affirmation did not seem to account for the fact that the plaintiff was involved in a second motor vehicle accident on August 16, 2013, at which time he "re-injured" his right knee, and the pain in his back "got worse."